T.C. Memo. 2009-134


UNITED STATES TAX COURT


COX ENTERPRISES, INC. & SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 18312-06.                    Filed June 9, 2009.


        C and A were either the sole or controlling
trustees of three trusts (the shareholder trusts) whose
corpora, together, consisted exclusively of 98 percent
of P's stock.  C and A were the income beneficiaries of
each trust for life, the remainder (corpus) to be
divided among their lineal descendants upon the death
of the survivor.

        In 1992, P tried to sell two TV stations but was
able to sell only one.  For valid business reasons, P
decided to operate the retained station, KTVU (TV), in
partnership with two family partnerships whose members
were C, A, their children, and entities they
controlled.  In 1993, to that end, KTVU, Inc., a wholly
owned second-tier subsidiary of P that owned and
operated KTVU (TV), contributed the KTVU (TV) station
assets (station assets) to the newly formed KTVU
Partnership in exchange for a majority partnership
interest.  The two family partnerships contributed cash
in exchange for their minority interests.  In 1996, the
family partnerships made additional cash contributions
to correct an inadvertent shortfall identified by an
independent consulting firm.

R alleges that, because KTVU, Inc.'s partnership interest in KTVU Partnership was worth $60.5 million less than the station assets it contributed to KTVU Partnership, KTVU, Inc., gratuitously transferred valuable partnership interests to the family partnerships. R argues that, because of (1) the identity of interests between the beneficiaries of the shareholder trusts and the members of the family partnerships and (2) the effective control by C and A over the corporate actions of P and its subsidiary, KTVU, Inc., that transfer was made for the benefit of the shareholder trusts, resulting in a constructive dividend distribution of appreciated property by P to the shareholder trusts taxable to P under sec. 311(b), I.R.C.

P moves for summary judgment. P admits, for purposes of the motion, a $60.5 million disparity between the value of the station assets KTVU, Inc., contributed to KTVU Partnership and the value of the partnership interest it received in return.

Held: Because the undisputed facts establish that it was not the primary purpose of the assumed gratuitous transfer of partnership interests to the family partnerships to provide an economic benefit to them and, derivatively, to the shareholder trusts, that assumed transfer (which, under the agreed facts, we find to have been unintentional and not beneficial to the shareholder trusts) did not constitute a constructive dividend from P to the shareholder trusts resulting in taxable gain to P under sec. 311(b), I.R.C. See Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d 634, 640-641 (11th Cir. 1984), affg. T.C. Memo. 1982-314; Sammons v. Commissioner, 472 F.2d 449, 451-454 (5th Cir. 1972), affg. in part, revg. in part, and remanding T.C. Memo. 1971-145.

Judith A. Mather, Bernard J. Long, Jr., and Alejandro L. Bertoldo, for petitioner.

Bonnie L. Cameron, for respondent.

MEMORANDUM OPINION

HALPERN, Judge:  Petitioner is the common parent of an affiliated group of corporations making a consolidated return of income.  By notice of deficiency (the notice), respondent determined deficiencies in the group's Federal income tax for its 1992, 1993, 1994, and 1996 taxable (calendar) years.  Petitioner timely filed a petition disputing a portion of the proposed $24,839,810 deficiency for 1993.  Petitioner has moved for summary judgment (the motion).[1]  Respondent objects.  The issue for decision is whether a member of the group (petitioner's wholly owned second-tier subsidiary) must recognize gain under section 311(b)[2] in connection with its transfer of assets to a newly formed partnership in exchange for an interest in that partnership.  The motion asks that we enter judgment in petitioner's favor "finding as a matter of law that, contrary to * * * [the notice], petitioner need not recognize gain under section 311(b) * * * in the amount of $56,182,115, or in any other amount, upon the formation * * * [of the partnership]."

---

[1] Petitioner assigned no error to respondent's determination of deficiencies for 1992, 1994, and 1996, and it disputes only a portion of the deficiency respondent determined for 1993.  Our resolution of the motion in petitioner's favor disposes of that dispute but leaves an undetermined deficiency for 1993.  We shall order the parties to submit their separate computations or a joint computation of the remaining deficiency for that year.

[2] Unless otherwise noted, all section references are to the Internal Revenue Code in effect for 1993 and all Rule references are to the Tax Court Rules of Practice and Procedure.  The notice refers to gain under sec. 311(d), but the parties agree (and we accept) that the intended reference is to sec. 311(b).

## Background

Summary Judgment

A summary judgment is appropriate "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law."  Rule 121(b).  In response to a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of such party's pleading, but such party's response, by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial."  Rule 121(d).

Facts on Which We Rely

Petitioner is a Delaware corporation with its principal offices in Atlanta, Georgia.  Petitioner is primarily engaged, through subsidiaries, in newspaper publishing and the ownership and operation of cable television systems, radio and television broadcasting stations, and wholesale and retail automobile auctions and related businesses.  At all times relevant to the motion, Cox Communications, Inc. (CCI), a wholly owned subsidiary of petitioner, owned KTVU, Inc., which, until September 1, 1993, owned and operated station KTVU (TV), serving the San Francisco/Oakland, California, market.

At all times relevant to the motion, petitioner's principal shareholders were three trusts (together, the shareholder trusts) formed by the former governor of Ohio, James M. Cox (Mr. Cox),

which collectively owned approximately 98 percent of petitioner's issued and outstanding stock. Two of those trusts (the Atlanta trusts) were established in 1941, one (Atlanta Trust I) for the benefit of Mr. Cox's daughter, Anne Cox Chambers (Mrs. Chambers), as income beneficiary for life, and her lineal descendants, as holders of the remainder interest, and the other (Atlanta Trust II) for the benefit of Mr. Cox's daughter, Barbara Cox Anthony (Mrs. Anthony), as income beneficiary for life, and her lineal descendants, as holders of the remainder interest. The third trust (the Dayton trust), established in 1943 and modified in 1984, benefited both daughters, as income beneficiaries for life, and their lineal descendants, as successor income beneficiaries and holders of remainder interest. At all times relevant to the motion, Mrs. Anthony was the trustee of Atlanta Trust I, Mrs. Chambers was the trustee of Atlanta Trust II, and each was one of three cotrustees of the Dayton trust.[3] At all times relevant to the motion, each Atlanta trust owned approximately 29 percent, and the Dayton trust owned approximately 40 percent, of petitioner's stock. The balance of petitioner's stock was held by other parties, principally petitioner's employees, none of whom were members of the Cox family.

---

[3] Although the three trust instruments are not part of the record in this case, they are before the Court in a related case arising out of the same transaction, Chambers v. Commissioner, docket Nos. 16698-06 and 16699-06, and, in various parts, have been described by both parties in their filings with respect to the motion. There appears to be no dispute as to the terms of the instruments, and, therefore, we shall take notice of those terms. See Fed. R. Evid. 201.

At all times relevant to the motion, Mrs. Chambers and Mrs. Anthony were members of petitioner's eight-member board of directors (the board) and Mrs. Anthony's son, James Cox Kennedy, was chairman of the board and petitioner's chief executive officer (CEO) and president.

By agreement dated August 1, 1993, Mrs. Chambers's three children and an entity Mrs. Chambers wholly owned formed ACC Family Partnership (ACC Partnership). The three children were limited partners, and each owned a 31.66-percent interest in ACC Partnership.

By agreements dated August 1, 1993, Mrs. Anthony, her two children and/or entities (corporations and trusts) they owned or controlled formed two partnerships. By September 1, 1993, the two partnerships merged and became the Anthony Family Partnership (BCA Partnership). BCA Partnership was a general partnership of which KTVU-BCA, Inc., an entity wholly owned by Mrs. Anthony, owned approximately 4 percent and entities (corporations and trusts, including trusts for Mrs. Anthony's grandchildren) owned or controlled by Mrs. Anthony's children owned approximately 96 percent.

One of the stated purposes for the formation of ACC Partnership and the two partnerships that became BCA Partnership was to "invest in interests in the KTVU Partnership".

On August 1, 1993, KTVU, Inc., ACC Partnership, and the two family partnerships that, by September 1, 1993, had merged to become BCA Partnership formed KTVU Partnership. KTVU Partnership was formed to acquire and operate television station KTVU (TV). During 1993, petitioner's shareholders did not include ACC Partnership, BCA Partnership (together, the family partnerships) or any of their respective partners. A diagram showing the relationships of the various trusts, corporations, and partnerships that we have described (and certain information yet to be described) is attached to this report as an appendix.

Pursuant to the terms of the KTVU Partnership agreement, KTVU, Inc., became the managing general partner and received a majority partnership interest, which entitled it to 55 percent of partnership distributable profits and liquidation proceeds up to specified base amounts and 75 percent of distributable profits and liquidation proceeds in excess of those base amounts. ACC Partnership and BCA Partnership each received a 22.5-percent interest in distributable profits and liquidation proceeds up to the same specified base amounts and a 12.5-percent interest in distributable profits and liquidation proceeds in excess of those base amounts.[4] The KTVU Partnership agreement also contains the following subparagraph relating to "Tax Allocations":

---

[4] The profit interest BCA Partnership received from KTVU Partnership represents the sum of the profit interests received by the two partnerships that merged to create BCA Partnership.

4.6  Tax Allocations:  Code Section 704(c).

(a)  In accordance with Code section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its initial Gross Asset Value.

The "initial Gross Asset Value of any asset contributed by a Partner to the Partnership" is defined as "the gross fair market value of such asset, as determined by the contributing Partner and the Partnership".

On August 6, 1993, the executive committee of petitioner's board, which was composed of James Cox Kennedy (petitioner's CEO and president) and two nonfamily, outside directors (the executive committee), adopted a resolution on behalf of petitioner, which provided, in pertinent part, as follows:

RESOLVED, That the Company hereby ratifies and approves the formation by KTVU, Inc., a wholly owned subsidiary of the Company, and certain general and limited partnerships to be formed by Anne Cox Chambers, Barbara Cox Anthony and James C. Kennedy, and the children of such individuals (the "Family Partnerships"), of a new general partnership to be known as "KTVU Partnership," to operate Television Station KTVU, San Francisco, California, and to conduct the business presently conducted by KTVU, Inc., and that in consideration of the partnership interests to be acquired by KTVU, Inc. and the Family Partnerships, KTVU, Inc. shall contribute substantially all of its assets used in the conduct of Television Station KTVU and the Family Partnerships shall contribute cash in an amount corresponding to the fair market value of the partnership interests acquired by such Family Partnerships; and

RESOLVED, That the proper officers of the Company shall determine the final valuation of the KTVU Partnership and the percentage interest therein to be held by each of the Partners therein based on the contributions being made by each of them to insure that the formation of the KTVU Partnership and the acquisition of the interests therein by the Family Partnerships shall be on terms and conditions no less favorable to the Company or KTVU, Inc. than the terms and conditions that would apply in a similar transaction with persons who are not affiliated with the Company * * *

On September 1, 1993, KTVU, Inc., contributed to KTVU Partnership the assets of KTVU (TV), excluding approximately $25 million of KTVU, Inc.'s working capital, its interest in Sutro Tower, Inc. (the corporation owning the transmission tower the television station used), its interest in the San Francisco Giants Baseball Club, and its studio building (the contributed assets are hereafter referred to as the station assets). On the same day, ACC Partnership and BCA Partnership each contributed $27 million to KTVU Partnership.[5] That amount was based, in part, on an analysis by Arthur Andersen L.L.P. (Arthur Andersen) of "the appropriate marketability and minority interest discounts applicable to a minority interest in the KTVU Partnership as of August 1, 1993." The family partnerships' contributions to KTVU Partnership were financed by loans to the family partnerships by Texas Commerce Bank, N.A., and secured, in part, by each partnership's interest in KTVU Partnership. Mrs. Chambers and her three children guaranteed the loan to ACC Partnership, and

---

[5] BCA Partnership's contribution to KTVU Partnership represents the sum of the contributions made by the two partnerships that merged to create BCA Partnership.

Mrs. Anthony and her two children guaranteed the loan to BCA Partnership.

In 1996, petitioner's management discovered that errors had been made in computing the fair market value of each family partnership's interest in KTVU Partnership. The computations failed to take into account (1) the family partnerships' cash contributions totaling $54 million and (2) the reduced allocation to the family partnerships (and increased allocation to KTVU, Inc.) of income distributions and sale proceeds in excess of the base amounts specified in the KTVU Partnership agreement. Thereafter, petitioner (with the concurrence of the family partnerships) engaged the investment banking firm of Furman Selz, L.L.C. (Furman Selz), to determine, in the light of those computational errors, whether there should be an adjustment to the amounts the family partnerships contributed in exchange for their interests in KTVU Partnership. On June 30, 1996, Furman Selz, in its formal analysis, opined that, as of August 1, 1993, each family partnership's interest in KTVU Partnership had a fair market value of approximately $31 million. On September 12, 1996, in response to that analysis, each family partnership contributed an additional $4 million to KTVU Partnership.[6]

Petitioner's decision to continue operating KTVU (TV) through KTVU Partnership resulted from its inability to implement its decision to have KTVU, Inc., sell the station. Early in

---

[6] We have not been provided with the computations that led Furman Selz to conclude that the family partnerships had initially undercontributed to the partnerships.

1992, petitioner engaged McKinsey & Co. (McKinsey) to evaluate the prospects of several of its operating divisions, including its television broadcast business. McKinsey recommended that petitioner retain its stations affiliated with the then major television networks, but that it dispose of its two Fox affiliates, KTVU (TV) and WKBD (TV), the latter serving the Detroit, Michigan, area. Later in 1992, petitioner engaged Morgan Stanley & Co. (Morgan Stanley) to assist in the sale of both stations. Morgan Stanley's efforts resulted in limited expressions of interest in acquiring the two stations; and, although petitioner was eventually able to sell WKBD (TV), a rapidly declining market during the fourth quarter of 1992 caused petitioner to terminate efforts to solicit offers for KTVU (TV). Operating that station through KTVU Partnership provided a viable business alternative to a sale of the station in that it (1) responded, in part, to McKinsey's recommendation that petitioner reduce its investment in the television broadcast business,[7] (2) made KTVU, Inc.'s working capital available for use in nonbroadcast areas of petitioner's business, and (3) helped to allay concerns among petitioner's television broadcast executives that petitioner was forsaking the television business by

---

[7] We assume that the accomplishment of this objective was made possible, at least in part, by the family partnerships' initial $54 million investment in KTVU Partnership.

demonstrating the Cox family's continuing commitment to that business.[8]

Respondent's Notice of Deficiency

In 1999, in connection with his examination of petitioner's 1993 return, respondent engaged Business Valuation Services, Inc. (BVS), to opine as to the fair market value of (1) the station assets (2) KTVU, Inc.'s partnership interest in KTVU Partnership, and (3) the family partnerships' interests in that partnership. BVS arrived at a $300 million fair market value for the station assets, a $233.5 million fair market value for KTVU, Inc.'s partnership interest in KTVU Partnership, and a $34,342,500 fair market value for each family partnership's interest in KTVU Partnership, all as of August 1, 1993. Respondent subsequently increased the latter two values to $239.5 million and $34,912,500 to take into account the family partnerships' additional 1996 cash contributions. The foregoing adjusted values give rise to (1) a $60.5 million difference between the determined fair market value of the contributed station assets and the determined fair market value of KTVU, Inc.'s partnership interest in KTVU Partnership and (2) a $7,825,000 difference between the

_____

[8] In his objection to the motion, respondent does not dispute petitioner's representations regarding the foregoing nontax motives for the formation of KTVU Partnership. Therefore, we treat those representations as true. See Rule 121(d); Jarvis v. Commissioner, 78 T.C. 646, 658-659 (1982) (granting summary judgment to the Commissioner where the taxpayer "failed to submit any information which contradicts * * * [the Commissioner's] factual determinations"); see also Beauregard v. Olson, 84 F.3d 1402, 1403 n.1 (11th Cir. 1996) (accepting as true undisputed facts submitted in connection with a motion for summary judgment).

determined value of the two family partnership interests in KTVU

Partnership and the $62 million those partnerships contributed.

On the basis of the first of those two differences,

respondent included in the notice the following adjustment to

petitioner's 1993 income under section 311(b):[9]

Other Income-Gain under IRC § 311(d) [sic]:

It is determined that you have a recognizable gain
under Section 311(d) [sic] of the Internal Revenue Code
related to property you distributed to your
shareholders during the taxable year 1993.  Your
taxable gain is $56,182,115 figured as follows:

| | |
|---|---:|
| Fair market value of KTVU, Inc. station assets | $300,000,000 |
| Less fair market value of KTVU, Inc. 55% interest received | 239,500,000 |
| Fair market value in excess of interest received (gain) | $ 60,500,000 |
| Less KTVU, Inc. basis in excess of fair market value (1) | 4,317,885 |
| Section 311(d) [sic] gain | $ 56,182,115 |

(1) $60,500,000/$300,000,000) x $21,411,000
= $4,317,885

---

[9] Sec. 311(b) provides, in pertinent part, as follows:

    SEC. 311 (b).  Distributions of Appreciated
               Property.--

        (1)  In general.--If--

           (A) a corporation distributes
property (other than an obligation of
such corporation) to a shareholder in a
distribution to which subpart A [secs.
301-307] applies, and

           (B) the fair market value of such
property exceeds its adjusted basis (in the
hands of the distributing corporation),

    then gain shall be recognized to the distributing
corporation as if such property were sold to the
distributee at its fair market value.

Therefore, your taxable income is increased $56,182,115
for the taxable year 1993.

Petitioner is willing to assume for purposes of the motion
that the value of the partnership interest KTVU, Inc., received
upon formation of KTVU Partnership was $239.5 million and that
that value was $60.5 million less than the value of KTVU, Inc.'s
contribution to that partnership ($300 million).

Discussion

I.  Arguments of the Parties

    A.  Respondent

In his "Notice of Objection to * * * [the motion]",
respondent summarizes his position as follows:

> Petitioner, while under the direction and control
> of the trustees of Atlanta Trust I, the Atlanta Trust
> II, and the Dayton Trust ("Shareholder Trusts"),
> entered into a transaction with its subsidiary, KTVU,
> Inc., to distribute partnership interests to the
> partners of KTVU Partnership.  To the extent KTVU, Inc.
> contributed excess value, it is deemed to have received
> a partnership interest in the section 721 contribution.
> Subsequently, KTVU, Inc. made a constructive
> distribution of a portion of the KTVU Partnership
> interest for the benefit of the Shareholder Trusts,
> which triggered section 311(b) gain.

In his accompanying memorandum of law, respondent restates
his position:

> Simply stated, in the simultaneous transfers made by
> KTVU, Inc. ("Petitioner's Subsidiary") and by two
> partnerships to the newly formed KTVU Partnership, the
> two transferors received partnership interests in
> excess of the value of the assets they transferred, and
> the Petitioner's Subsidiary received a partnership
> interest of value less than the value of the property
> it transferred.  The partners which received greater
> interests were related to the shareholders of
> Petitioner's Subsidiary, so that their receipt of value
> greater than the amount they transferred to the

partnership was a constructive distribution to the shareholders of Petitioner's Subsidiary. There was no negotiation of a business benefit to the Petitioner's Subsidiary for the excess value which it transferred to the partnership. The facts demonstrate that the economic reality of what has occurred is a distribution of appreciated property in the form of partnership interests to the shareholders of Petitioner's Subsidiary. Accordingly, Respondent asserted a deficiency based on the application of section 311(b).

The point appears to be that there was an identity of interests between the shareholder trusts and the family partnerships, i.e., the beneficiaries of the former and the partners in the latter were, as a practical matter, identical (Mrs. Chambers, Mrs. Anthony, and the lineal descendants of each), with the result that the family partnerships' gratuitous receipt from KTVU, Inc., of enhanced or additional partnership interests in KTVU Partnership constituted, in substance, a distribution from petitioner to or for the benefit of the shareholder trusts, taxable to petitioner under section 311(b).

In respondent's view, the benefit to the shareholder trusts arose because, after the formation of KTVU Partnership, the beneficiaries of those trusts "now held an interest, as either a partner in a Family Partnership or a sole shareholder in a corporation which was a partner in a Family Partnership, in assets that were previously held by KTVU, Inc."[10] In other

---

[10] We interpret respondent's reference to "an interest * * * in assets that were previously held by KTVU, Inc." as relating to the family partnerships' interests in station assets worth $60.5 million that respondent alleges were given to them, not to their interest in the balance of the station assets that they are deemed to have purchased with their cash contributions to KTVU Partnership.

words, through the family partnerships, the shareholder trust beneficiaries had eliminated the shareholder trusts and the three corporate layers that separated them from ownership of the station assets. Significantly, they had defeated the temporal division into life estates and remainders the terms of the shareholder trusts imposed so that, for instance, all the partners (direct and indirect) of the family partnerships, and not just Mrs. Chambers and Mrs. Anthony, shared in current income generated by the station assets.[11]

In further support of his position that the primary purpose for the formation of KTVU Partnership was to benefit the shareholder trusts, respondent argues that that transaction was orchestrated by the controlling trustees of those trusts, Mrs. Chambers and Mrs. Anthony, in their capacities as members of petitioner's board and by Mrs. Anthony's son, James Cox Kennedy, a remainder beneficiary of those trusts, in his multiple capacities as petitioner's CEO and president, chairman of

---

[11] We note that, in one of his filings with this Court in Chambers v. Commissioner, docket Nos. 16698-06 and 16699-06, but not in this case, respondent argues that the formation of KTVU Partnership also provided a tax avoidance benefit to Mrs. Chambers and Mrs. Anthony individually:

> What occurred here was a shifting of the life beneficiaries' income interests to the remainder beneficiaries prior to the deaths of * * * [the former], resulting in * * * [the latter's] receiving an accelerated gift of the trust income * * *. This occurrence also caused the income attributable to the life beneficiaries to escape taxation.

In other words, the formation of KTVU Partnership effected an assignment of income without payment of gift or income taxes by the assignors, Mrs. Chambers and Mrs. Anthony.

petitioner's board, and member of the board's executive committee, which actually ratified and approved the formation of KTVU Partnership.

Respondent bases his argument that there was a section 311(b) distribution by petitioner on caselaw holding that a corporation's transfer of money or property to a third party primarily for the direct or tangible benefit of a shareholder gives rise to a constructive dividend or distribution to that shareholder,[12] and caselaw finding the requisite benefit to the shareholder when the primary purpose of the distribution is to benefit a member of the shareholder's family.[13]

Although respondent argues that petitioner's transfer, through KTVU, Inc., of "additional value in the form of increased partnership interests" to the family partnerships was made "for the benefit of [the] Shareholder Trusts, rather than directly to them," respondent also characterizes the constructive distribution as a distribution to the shareholder trusts through the affiliated group; i.e., "a distribution of partnership

---

[12] See, e.g., Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d 634, 640-641 (11th Cir. 1984), affg. T.C. Memo. 1982-314; Sammons v. Commissioner, 472 F.2d 449, 451-454 (5th Cir. 1972), affg. in part, revg. in part and remanding T.C. Memo. 1971-145; Commissioner v. Makransky, 321 F.2d 598, 601-602 (3d Cir. 1963), affg. 36 T.C. 446 (1961); Gilbert v. Commissioner, 74 T.C. 60, 64 (1980).

[13] See, e.g., Hagaman v. Commissioner, 958 F.2d 684, 690-691 (6th Cir. 1992), affg. and remanding on other issues T.C. Memo. 1987-549; Green v. United States, 460 F.2d 412, 419 (5th Cir. 1972); Byers v. Commissioner, 199 F.2d 273, 275-276 (8th Cir. 1952), affg. a Memorandum Opinion of this Court; Epstein v. Commissioner, 53 T.C. 459, 471-475 (1969).

interests by KTVU, Inc. to CCI, followed by subsequent distributions of the partnership interests from CCI to * * * [petitioner] and * * * [petitioner] to the Shareholder Trusts."[14]

Finally, in his memorandum of law under the heading "CONCLUSION", respondent states as follows:

> Petitioner's Motion for Summary Judgment must fail. This case presents factual issues relating to valuation, and intertwined factual and legal issues regarding whether a distribution was made, and the determination of whether the distribution was made with respect to stock. Petitioner, in its abbreviated statement of facts to the Court, conveniently omitted facts which are crucial to understanding the issues. As such, summary judgment is not appropriate.

B. <u>Petitioner</u>

Petitioner first argues that section 311(b) simply does not apply to the formation of KTVU Partnership because there was no distribution of appreciated property by petitioner to its shareholders, "but rather, a contribution of property by KTVU, Inc. to KTVU partnership in exchange for a partnership interest

---

[14] Because the first two of those alleged deemed distributions occur between members of an affiliated group within the meaning of sec. 1504, respondent notes that, under the consolidated return regulations in effect during 1993, sec. 311(b) gain is taken into account by the distributing corporation (KTVU, Inc.) upon the final alleged deemed distribution from petitioner to the shareholder trusts. See sec. 1.1502-14T(a), Temporary Income Tax Regs., 53 Fed. Reg. 12679 (Apr. 18, 1988), amended by 55 Fed. Reg. 9424 (Mar. 14, 1990) and 58 Fed. Reg. 13412 (Mar. 11, 1993). Respondent further notes that, in his view, KTVU, Inc.'s distribution of additional value to the family partnerships simultaneously triggered all three deemed distributions, and thus its recognition of the alleged sec. 311(b) gain is immediate.

* * * governed by * * * sections 721(a) and 704(c)(1)(A)."[15]
Consistent with that view, petitioner argues that (1) any
disproportionally large partnership interests received by the
family partnerships were not received by "shareholders" of
petitioner, (2) the "built-in gain inherent in the * * * [station
assets]", rather than being taxable to petitioner under section
311(b), "is recognized by KTVU, Inc. in accordance with the
section 704(c) requirements", and (3) pursuant to those
requirements, as set forth in regulations under section 704(c),

> a disproportionately higher amount of income and gain
> [is allocated] to KTVU, Inc. over the tax life of the
> contributed assets, so that over that period KTVU, Inc.
> will be allocated the entire amount of the [built-in]

---

[15] Sec. 721(a) provides as follows:

SEC. 721.   NONRECOGNITION OF GAIN OR LOSS ON CONTRIBUTION.

    (a)   General Rule.--No gain or loss shall be recognized
to a partnership or to any of its partners in the case of a
contribution of property to the partnership in exchange for
an interest in the partnership.

  Sec. 704(c)(1)(A) provides as follows:

SEC. 704.   PARTNER'S DISTRIBUTIVE SHARE.

    (c)   Contributed Property.--

    (1)   In general.--Under regulations
prescribed by the Secretary--

        (A)   income, gain, loss, and deduction
    with respect to property contributed to
    the partnership by a partner shall be shared
    among the partners so as to take account of
    the variation between the basis of the
    property to the partnership and its fair
    market value at the time of contribution * *
    *

>gain inherent in the KTVU Station Assets at the time of contribution.

See sec. 1.704-1(b)(1)(vi), (5), Example (13)(i) (built-in gain on partnership's sale of property taxed to contributing partner), Income Tax Regs.; see also 1 McKee et al., Federal Taxation of Partnerships and Partners, par. 10.04[1], at 10-109 through 10-110 (2d ed. 1990). Petitioner concludes: "Thus, except for timing differences, section 704(c) puts KTVU, Inc. in the same position as if KTVU Inc.'s contribution of the KTVU Station Assets to KTVU Partnership had been immediately taxable as a sale for fair market value."[16]

---

[16] In support of its position that sec. 704(c), rather than sec. 311(b), is the appropriate vehicle for taxing KTVU, Inc., on any and all built-in gain attributable to the station assets KTVU, Inc., contributed to KTVU Partnership, petitioner relies on the decision of the Court of Appeals for the Sixth Circuit in Shunk v. Commissioner, 173 F.2d 747, 750-752 (6th Cir. 1949), revg. 10 T.C. 293 (1948). In Shunk, the Court of Appeals rejected the finding of this Court that an apparent bargain sale by Shunk Manufacturing Co. (Shunk) to a newly formed partnership in which its shareholders held a five-sixths interest constituted a constructive dividend from Shunk to its shareholders. See Shunk v. Commissioner, 10 T.C. at 303-307. The Court of Appeals concluded:

>The property sold by * * * [Shunk] was sold to the partnership; it was not a transfer (or distribution) to its * * * shareholders * * *. To hold otherwise would completely ignore the legal concept of a partnership. * * * [Shunk v. Commissioner, 173 F.2d at 751.]

Petitioner also relies on certain legislative history attendant to the repeal of the General Utilities doctrine (derived from the Supreme Court's opinion in Gen. Utils. & Operating Co. v. Helvering, 296 U.S. 200 (1935), and stating that a corporation generally did not recognize gain or loss on a distribution of appreciated or depreciated property to its shareholders with respect to its stock). S. Rept. 100-445 (1988) is the report of the Committee on Finance accompanying S. 2238, 100th Cong., 2d Sess. (1988), which formed the basis for part of

(continued...)

Even assuming arguendo that sections 721 and 704(c) are not the exclusive governing provisions, petitioner argues that section 311(b) would still not apply because petitioner made no distribution to any of its shareholders. Petitioner purports to distinguish the caselaw respondent cites in support of his argument that KTVU, Inc.'s gratuitous transfer of partnership interests to the family partnerships was for the benefit of the shareholder trusts and, therefore, constituted a constructive dividend to those trusts. Petitioner argues that the

---

[16](...continued)
the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, sec. 1006(e)(5)(A), 102 Stat. 3400, which amended sec. 337(d). In pertinent part, the report states:

> Section 704(c) of the Code generally requires that gain attributable to appreciated property contributed to a partnership by a partner be allocated to that partner; it is expected that this rule would generally prevent the use of a partnership to avoid the purposes of the amendments made by subtitle D of Title VI of the Act (for example, by attempting to shift the tax on C corporation appreciation to another party or to a non-C corporation regime). * * * [S. Rept. 100-445, supra at 67.]

Petitioner cites the foregoing statement as confirmation of its view that the Code provisions effecting the repeal of the General Utilities doctrine, including sec. 311(b), "are not intended to apply where section 704(c) already applies to tax the gain to the corporate transferor."

Finally, petitioner adds that the reference in sec. 704(c) to fair market value is a reference to true fair market value so that, if, in fact, the station assets have been undervalued as respondent claims, respondent "can challenge that valuation * * * [and] require that the section 704(c) allocations be based upon accurate fair market value." In other words, the appropriate adjustment would be to increase KTVU, Inc.'s built-in gain taxable to KTVU, Inc., under sec. 704(c), not to find a deemed distribution by petitioner taxable to petitioner under sec. 311(b).

constructive distributees in the cited cases had the authority to effect the transfers in question whereas Mrs. Chambers and Mrs. Anthony, in their capacity as trustees of the shareholders trusts, were without authority, under the trust instruments, to transfer KTVU Partnership interests (which would represent additions to trust principal) to anyone until termination of the trusts. Petitioner also notes that (1) "Mrs. Anthony and Mrs. Chambers, as two of the eight directors [of petitioner], controlled neither the board nor any decisions regarding business ventures, including the KTVU Partnership", and (2) "it cannot * * * be assumed that the independent directors [on the executive committee] * * * acted to favor non-shareholders of * * * [petitioner] by directing KTVU. [sic] Inc. to distribute 'extra' partnership interests to * * * [the family partnerships] contrary to their duties as directors and members of the executive committee." Thus, even if Mrs. Chambers and Mrs. Anthony had had the authority to effect the transfer of "extra" partnership interests in KTVU Partnership to the family partnerships, they lacked the power to do so, and the outside (nonfamily) directors' power to effect that transfer was circumscribed by their fiduciary responsibilities to petitioner.

Finally, petitioner argues that even if one assumed a distribution of partnership interests to the family partnerships, the "[t]he Family Trusts * * * received absolutely no benefit, direct, tangible or otherwise, as a result of the assumed distribution". Indeed, petitioner argues that the shareholder

trusts would have been harmed by such distributions because premature distributions of trust principal would have contradicted the terms of the respective trust instruments (violating the trustees' duties of impartiality) and diminished the trustees economic ability to carry out Mr. Cox's wishes.[17]

II. Analysis

A. Existence of a Genuine Issue of Material Fact

Because, for purposes of the motion, petitioner concedes a $300 million value for the station assets contributed by KTVU, Inc., to KTVU Partnership and a $239.5 million value for the partnership interest it received in exchange therefor, valuation is not an issue herein. Moreover, respondent does not identify the "intertwined factual and legal issues regarding whether a distribution was made" or whether it "was made with respect to stock",[18] nor does he identify the "conveniently omitted facts which are crucial to understanding the issues." Therefore, because respondent has failed to satisfy the requirement of Rule 121(d) to "set forth specific facts showing that there is a

---

[17] In other words, the family trusts would have been harmed because such distributions were not permitted by the trust instruments and would, to the extent made, deprive the trustees of the wherewithal to carry out the settlor's wishes.

[18] We find that the question of whether KTVU, Inc.'s exchange of the station assets for a majority partnership interest in KTVU Partnership involved a distribution by petitioner with respect to its stock, for purposes of secs. 301(a) and 311(b), raises an issue of law to be decided by applying the applicable caselaw, discussed infra, to the undisputed facts.

genuine issue for trial", we will not deny the motion for that reason.

### B. Existence of a Dividend Subject to Section 311(b)

#### 1. Respondent's Alternative Positions

Respondent argues that, in substance, KTVU, Inc.'s assumed gratuitous transfer of partnership interests in KTVU Partnership to the family partnerships constituted a constructive dividend from petitioner to the shareholder trusts causing petitioner to recognize $60.5 million of unrealized gain pursuant to section 311(b).[19]  Respondent appears to have charted two alternative

---

[19] Petitioner's concession regarding the $60.5 million disparity between the value of the station assets KTVU, Inc., contributed to KTVU Partnership and the value of the partnership interest it received is not a concession that the family partnerships' partnership interests were enhanced by that amount. Indeed, in response to an informal discovery request from petitioner, respondent states his positions that (1) the property he asserts KTVU, Inc., distributed was a partnership interest in KTVU Partnership while (2) the property to be valued to determine gain under sec. 311(b) is the KTVU, Inc., assets contributed to that partnership.  He continues:  "The fair market value component of property distributed by KTVU, Inc. under I.R.C. § 311(b) would be the same whether the constructively distributed property is KTVU television assets or an interest in the partnership."  Respondent relies on Pope & Talbot, Inc. v. Commissioner, 162 F.3d 1236 (9th Cir. 1999), affg. 104 T.C. 574 (1995), in support of that position.  In Pope & Talbot, Inc. v. Commissioner, supra at 1239, the Court of Appeals held that, for purposes of determining Pope & Talbot, Inc.'s hypothetical gain under what is now sec. 311(b)(1), the hypothetical sale was of the property the corporation owned at the time of the distribution (improved and unimproved real property) and not the aggregate value of the individual limited partnership units the corporation distributed.  There appears here to be a discrepancy between the $60.5 million difference in value that respondent would cause petitioner to treat as resulting in recognized gain under sec. 311(b) and the $7,825,000 difference between the determined value of the two family partnership interests in KTVU Family Partnership and the $62 million those partnerships contributed.  We need not resolve that discrepancy.  The sole
(continued...)

paths to arrive at that result.  Under one approach, he argues that the transfer was, in fact, to the family partnerships, but that it was for the benefit of the shareholder trusts and, therefore, constituted a constructive dividend to those trusts. Under the other, he posits a constructive dividend from KTVU, Inc., to its parent, CCI, and from CCI to its parent, petitioner, followed by petitioner's constructive distribution to the shareholder trusts.  Respondent appears to favor the first path, stating that "[f]or purposes of this case, it is only necessary to establish that appreciated assets left the corporate solution of KTVU, Inc., for the benefit of its Shareholder Trusts".[20] Assuming that the transfer to the family partnerships was for the benefit of the shareholder trusts, respondent's apparently favored approach is clearly sustainable under the applicable caselaw (discussed _infra_).  Therefore, since respondent does not

---

[19](...continued)
issue involved in the motion is the existence (or nonexistence) of a sec. 311(b) distribution of property, not the identity or value of the transferred property.  Petitioner argues that, "even assuming" the family partnerships received partnership interests worth more than their cash contributions, to trigger the application of sec. 311(b) that assumed transfer from KTVU, Inc., to the family partnerships must constitute a distribution from petitioner to the shareholder trusts, which, in petitioner's view, it does not.

[20] We find additional support for our view that respondent favors the first path in his statements that "the characterization and taxation of the transfer, _if any_, of the partnership interests from the Shareholder Trusts to the Family Partnerships is not here at issue" (emphasis added), and "the relationships between the Shareholder Trusts, their beneficiaries, and the Family Partnerships illustrate that the transfer to the Family Partnerships was directed by and _for the benefit of_ [i.e., not _to_] the Shareholder Trusts" (emphasis added).

claim that it makes any difference, and since he appears to favor the first path, the issue we address is whether KTVU, Inc.'s assumed gratuitous transfer to the family partnerships constituted, in substance, a constructive dividend by petitioner to the shareholder trusts subject to section 311(b).

### 2. Discussion

#### a. Introduction

Petitioner's principal argument is a legal argument that the Internal Revenue Code provisions pertaining to partners and partnerships (subtitle A, chapter 1, subchapter K), preempt application of the provisions pertaining to corporate distributions and adjustments (subtitle A, chapter 1, subchapter C) when considering the tax effects of a partner's capital contribution to a partnership. More precisely, petitioner argues that section 704(c), which, like section 311(b), effectively taxes KTVU, Inc., on the built-in gain associated with the station assets, preempts the application of section 311(b) to any portion of that gain.[21]

---

[21] Although sec. 704(c)(1)(A) taxes the contributing partner on any built-in gain associated with property that partner contributed, on Sept. 1, 1993, the date of KTVU, Inc.'s contribution of the station assets to KTVU Partnership, contributors of property to a partnership were still permitted to rely on regulations issued under prior law, which made the contributor's recognition of the entire built-in gain elective. See sec. 1.704-1(c)(2), Income Tax Regs., which was replaced by regulations effective for contributions made on or after Dec. 21, 1993. TD 8500, 1994-1 C.B. 183; see also 1 McKee et al., Federal Taxation of Partnerships and Partners, par. 10.04[3], at 10-113 (2d ed. 1990). According to article 4.6(a) of the KTVU Partnership agreement, the partners made that election, and for that reason KTVU, Inc., was, in fact, taxable on the built-in

(continued...)

Because we decide the motion on grounds that effectively render moot the legal issues petitioner raises, we need not address either the preemption issue or petitioner's argument that Mrs. Chambers and Mrs. Anthony, in their dual capacities as controlling trustees of the shareholder trusts and members of petitioner's board, had neither the authority nor the power to effect a contribution of the station assets by KTVU, Inc., to KTVU Partnership for the benefit of anyone until termination of the shareholder trusts.[22]  We shall grant petitioner's motion on the ground to which petitioner also alludes, that the undisputed facts fail to demonstrate that KTVU, Inc.'s assumed gratuitous transfer of partnership interests to the family partnerships was made primarily to benefit the shareholder trusts, or, alternatively, that it actually provided a benefit to the shareholder trusts.

---

[21](...continued)
gain associated with the station assets as petitioner alleges.

[22] The issue of whether Mrs. Chambers and Mrs. Anthony (who, as controlling trustees of the shareholder trusts, were, arguably, in a position to select all the members of petitioner's board) had the power to control petitioner's board and its decisions would appear to present a question of material fact sufficient to result in a denial of the motion were deciding that issue necessary.  See Green v. United States, 460 F.2d at 420 ("[T]he appropriate test for determining control over corporate action * * * is whether the taxpayer has exercised substantial influence over the corporate action * * * .  The inquiry is factual".).  Because we find resolving the "power" issue unnecessary, we need not deny the motion on that ground.

### b. The Caselaw

In <u>Sammons v. Commissioner</u>, 472 F.2d 449, 451-452 (5th Cir. 1972), affg. in part, revg. in part and remanding T.C. Memo. 1971-145, the Court of Appeals for the Fifth Circuit set forth standards for determining whether a corporation's transfer of property to a third party constitutes a dividend to the transferor corporation's shareholder(s).[23]  The taxpayer in <u>Sammons</u> guaranteed and then assumed a debt obligation of a second-tier subsidiary of a corporation 99 percent owned by the taxpayer.  The issue was whether the taxpayer's purchase of preferred stock from its insolvent or near insolvent second-tier subsidiary was primarily intended to provide that subsidiary with funds sufficient to reimburse the taxpayer for his payment of the subsidiary's debt obligation with the result that that transaction gave rise to a constructive dividend to the taxpayer.  After acknowledging the "well-established principle that a transfer of property from one corporation to another corporation may constitute a dividend to * * * [a common shareholder of] both corporations", <u>id.</u> at 451, the Court of Appeals set forth what it described as a subjective and an objective test for determining

_____

[23] Barring a stipulation to the contrary, this case is appealable to the Court of Appeals for the Eleventh Circuit.  See sec. 7482(b)(1)(B).  The Court of Appeals for the Eleventh Circuit has held that any case the Court of Appeals for the Fifth Circuit decided before Oct. 1, 1981, is binding precedent upon it.  See <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1207 (11th Cir. 1981).  <u>Sammons v. Commissioner</u>, 472 F.2d 449 (5th Cir. 1972), which we have followed in determining whether an intercorporate transfer constitutes a constructive dividend to a common shareholder, e.g., <u>Chan v. Commissioner</u>, T.C. Memo. 1997-154, is such a case.

whether such a transfer does, in fact, constitute a dividend from the transferor corporation to the shareholder.  The subjective or primary purpose test requires that the distribution or transfer be made primarily for the benefit of the shareholder rather than for a valid business purpose.  Id.  The objective or distribution test requires that the distribution or transfer caused "funds or other property to leave the control of the transferor corporation and * * * [allowed] the stockholder to exercise control over such funds or property either directly or indirectly through some instrumentality other than the transferor corporation."  Id.  Both tests must be satisfied to find a constructive dividend to the shareholder of the transferor corporation.  Id.

In Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d 634, 641 (11th Cir. 1984), affg. T.C. Memo. 1982-314, the Court of Appeals for the Eleventh Circuit cites with approval the observation of the Court of Appeals for the Fifth Circuit in Kuper v. Commissioner, 533 F.2d 152, 160 (5th Cir. 1976), affg. in part and revg. in part 61 T.C. 624 (1974), that, in applying the Sammons primary purpose test, "the search for this underlying purpose usually involves the objective criterion of actual primary economic benefit to the shareholders as well"; i.e., there is an "objective facet" of that test that "inevitably overlaps with the Sammons' objective distribution test".  The Court of Appeals for the Eleventh Circuit states the point as follows:

In determining whether the primary purpose test has been met, we must determine not only whether a subjective intent to primarily benefit the shareholders exists, but also whether an actual primary economic benefit exists for the shareholders. * * * [Stinnett's Pontiac Serv., Inc. v. Commissioner, supra at 641.]

Accord Gilbert v. Commissioner, 74 T.C. 60, 64 (1980) ("[T]ransfers between related corporations can result in constructive dividends to their common shareholder if they were made primarily for his benefit and if he received a direct or tangible benefit".).

If the benefit to the shareholder is "indirect or derivative in nature, there is no constructive dividend." Id.; see also Rushing v. Commissioner, 52 T.C. 888, 894 (1969) ("[W]hatever personal benefit, if any, Rushing [the sole shareholder of the transferor and transferee corporations] received was derivative in nature. Since no direct benefit was received, we cannot properly hold he received a constructive dividend."), affd. on another issue 441 F.2d 593 (5th Cir. 1971).

Finally, as respondent points out in his memorandum of law in support of his notice of objection, courts have found the requisite benefit to the shareholder when the primary purpose of the corporation's distribution or transfer of money or property is to or for the benefit of a member of the shareholder's family. See, e.g., Hagaman v. Commissioner, 958 F.2d 684, 690-691 (6th Cir. 1992), affg. and remanding on other issues T.C. Memo. 1987-549; Green v. United States, 460 F.2d 412, 419 (5th Cir. 1972); Byers v. Commissioner, 199 F.2d 273, 275 (8th Cir. 1952), affg. a

Memorandum Opinion of this Court; Epstein v. Commissioner, 53 T.C. 459, 471-475 (1969).

In both Green and Epstein, the courts' approach was to decide whether there had been a bargain sale by a corporation the taxpayer controlled to trusts for the benefit of his minor children (and, therefore, a constructive dividend to the taxpayer) on the basis of the parties' competing valuations of the property sold. We conclude, however, that neither case stands for the proposition that the mere finding of a bargain sale based on competing property valuations requires a finding that the transfer constitutes a constructive dividend to the shareholder, regardless of intent.

In Green v. United States, supra at 420, the Court of Appeals focused on two issues: valuation of the property alleged to have been sold for a bargain price (which issue it remanded) and the shareholder's control over the corporation's actions; i.e., his "ability to divert a dividend or a bargain sale to * * * [his] chosen recipient". In addressing the latter issue, the Court of Appeals stated as follows:

> We emphasize that the finder of fact must also be allowed to consider, for what he thinks it is worth, that the corporation did in fact consummate a transaction with favorable consequences for the taxpayer personally or for his immediate family; this circumstance is surely one tending to prove that the taxpayer exercised substantial influence [the court's test for control] over corporate action. [Id. at 420-421.]

We consider that language to be fully consistent with the Court of Appeals' own primary purpose test set forth in Sammons v. Commissioner, supra, and, in particular, with the notion that the taxpayer necessarily would have exercised his "substantial influence over corporate action" for the sole purpose of benefiting his minor children.  Indeed, the Court of Appeals itself noted:  "The approach suggested is entirely consistent with * * * Sammons".  Green v. United States, supra at 421.

In Epstein, a case decided before Sammons, we found a constructive dividend to the taxpayer shareholder because we found a bargain sale by the corporation to trusts for the benefit of the taxpayer's children.  The latter finding was based on our determination of the property's value after reviewing the parties' after-the-fact expert witness valuations and the evidence underlying them.  Although there is no discussion of any need for evidence of corporate or shareholder intent to make a bargain sale, we clearly expressed our belief that that intent was present in the case.  For example, in justifying constructive dividend treatment, we observed:

> The device of having a corporation make a transfer of property, for no or insufficient consideration, to a person other than a stockholder has not been too successful in avoiding dividend treatment to the stockholder whose own purposes have been satisfied by such transfer. * * *
>
> "The petitioner controlled the Willoughby Co.  It acted solely to accommodate him in making the transfer. He enjoyed the use of the property by having it transferred for his own purposes. * * *"  [Epstein v. Commissioner, supra at 474-475 (quoting Clark v. Commissioner, 31 B.T.A. 1082, 1084 (1935), affd. 84 F.2d 725 (3d Cir. 1936)).]

The foregoing language leaves no doubt that our finding of a constructive dividend to the taxpayer shareholder was based principally on a finding that there was no business purpose for the bargain sale, and that it was solely motivated by the taxpayer's desire to confer an economic benefit on his children.

### c. Application of the Primary Purpose Test

#### (1) Petitioner's Intent in Forming KTVU Partnership

#### (a) Introduction

Respondent argues that "it is only necessary to establish that appreciated assets left the corporate solution of KTVU, Inc., for the benefit of its Shareholder Trusts, to establish that there has been a distribution with respect to [the] Shareholder Trusts' stock to which section 311 applies." He then argues that "the relationships between the Shareholder Trusts, their beneficiaries, and the Family Partnerships illustrate that the transfer to the Family Partnerships was directed by and for the benefit of the Shareholder Trusts." Lastly, as "[f]urther proof of benefit to the Shareholder Trusts," he argues: "As trustees of the Shareholder Trusts, Mrs. Chambers and Mrs. Anthony approved KTVU, Inc.'s receipt of less than fair market value for the appreciated assets transferred."

Assuming arguendo that Mrs. Chambers and Mrs. Anthony, acting in concert, were responsible for both petitioner's decision to form KTVU Partnership and the manner in which it was formed, the undisputed facts do not support respondent's characterization of that transaction. That is, the facts do not

support respondent's conclusion that Mrs. Chambers and Mrs. Anthony purposely approved KTVU, Inc.'s contribution of the station assets to KTVU Partnership in exchange for a less than fair market value partnership interest (i.e., that they caused KTVU, Inc., to deal with the family partnerships at less than arm's length) to provide an economic benefit to the family partnerships and, derivatively, to the shareholder trusts. Even assuming an identity of interests among the entities involved in the transaction (petitioner, KTVU, Inc., the shareholder trusts, and the family partnerships), that is not, in and of itself, evidence that the related individuals common to those entities (and, in particular, Mrs. Chambers and Mrs. Anthony) acted in concert purposely to violate the arm's-length standard in forming KTVU Partnership. See, e.g., Rushing v. Commissioner, 52 T.C. at 894 ("The fact that Rushing was the sole shareholder of both L.C.B. and Briercroft is not a sufficient basis for concluding that Rushing constructively received the advances of L.C.B. [to Briercroft.]"). Moreover, the undisputed facts strongly indicate that the parties to the formation of KTVU Partnership intended an arm's-length transaction.

(b) Factors Relating to Petitioner's Intent

(i) Business Reasons for the Formation of KTVU Partnership

As discussed supra, petitioner continued to operate KTVU (TV) through KTVU Partnership only because petitioner could not sell it. By operating the station in that manner petitioner was able to reduce its investment in the television broadcast

business, use KTVU, Inc.'s working capital in other business areas, and allay concerns among petitioner's television broadcast executives that petitioner was abandoning the television broadcast business by demonstrating the Cox family's ongoing commitment to it.

(ii)  The Executive Committee Resolution

The August 6, 1993, resolution of the executive committee of petitioner's board specifically required that the family partnerships' cash contributions to KTVU partnership be "in an amount corresponding to the fair market value of the partnership interests acquired by such Family Partnerships", and that the family partnerships' acquisition of partnership interests in KTVU Partnership "be on terms and conditions no less favorable to * * * [petitioner] or KTVU, Inc. than the terms and conditions that would apply in a similar transaction with persons who are not affiliated with * * * [petitioner]".

(iii)  The Outside Appraisals and Additional Cash Contributions by the Family Partnerships

Before forming KTVU Partnership, petitioner retained an outside accounting firm, Arthur Andersen, "to render an opinion of the appropriate marketability and minority interest discounts applicable to a minority interest in the KTVU Partnership as of August 1, 1993", the date of its formation.  Then, in 1996, because petitioner's management discovered that errors had been made in computing each family partnership's interest in KTVU Partnership, Furman Selz was retained to revalue those interests. Furman Selz determined that the correct fair market of each of

those interests as of August 1, 1993, was $31 million. On September 12, 1996, in response to that determination, each family partnership contributed an additional $4 million to KTVU Partnership to bring the total contribution of each to $31 million.

(iv)  Fiduciary Responsibilities of Petitioner's Board of Directors and Majority Shareholders

Respondent asserts (and petitioner here concedes) that KTVU, Inc., gratuitously transferred KTVU Partnership interests to the family partnerships and that Mrs. Chambers and Mrs. Anthony stood on both sides of the transaction. The parties, however, dispute whether those facts require us to find that Mrs. Chambers and Mrs. Anthony intended that gratuitous transfer. We agree with petitioner: In light of United States v. Byrum, 408 U.S. 125 (1972), we need not find intent on those facts alone.

Even assuming Mrs. Chambers and Mrs. Anthony controlled petitioner's board and could direct petitioner's actions, because the applicable State law imposes fiduciary duties on corporate directors and majority shareholders (e.g., Mrs. Chambers and Mrs. Anthony), we may not necessarily conclude (as respondent does) that Mrs. Chambers and Mrs. Anthony intended to make a gratuitous transfer to the family partnerships.

In United States v. Byrum, supra at 137-138, the Supreme Court observed that in almost every if not every State "[a] majority shareholder has a fiduciary duty not to misuse his power by promoting his personal interests at the expense of corporate interests" and that "the directors also have a fiduciary duty to

promote the interests of the corporation."  Whether petitioner's
majority shareholders and directors were subject to the laws of
Delaware (the State of petitioner's incorporation) or Georgia
(the State in which petitioner has its principal offices), they
had fiduciary responsibilities of the type referred to in Byrum.
See Ga. Code Ann. sec. 14-2-830(a) (2003) (enacted in 1981)[24] ("A
director shall discharge his duties as a director, including his
duties as a member of a committee:  (1) In a manner he believes
in good faith to be in the best interests of the corporation".);
In re Reading Co., 711 F.2d 509, 517 (3d Cir. 1983) ("Under
Delaware law, corporate directors stand in a fiduciary
relationship to their corporation and its stockholders", and "a
majority shareholder * * * has a fiduciary duty to the
corporation and to its minority shareholders if the majority
shareholder dominates the board of directors and controls the
corporation."); GLW Intl. Corp. v. Yao, 532 S.E.2d 151, 155 (Ga.
Ct. App. 2000) ("It is well settled that corporate officers and
directors have a fiduciary relationship to the corporation and
its shareholders and must act in good faith."); Marshall v. W.E.
Marshall Co., 376 S.E.2d 393, 396 (Ga. Ct. App. 1988)
("[M]ajority shareholder who really controls the corporation" has
a "fiduciary relationship * * * to protect minority shareholders"
and "majority shareholders must act in good faith when managing
corporate affairs".).

---

[24] See 1988 Ga. Laws p. 1070, sec. 1.

KTVU, Inc.'s assumed gratuitous transfer of a substantial partnership interest in KTVU Partnership necessarily would have reduced its distributive share of income and liquidation (or sale) proceeds from KTVU (TV) by the amounts that would have been attributable to that interest.  Thus, the assumed transfer necessarily would have resulted in financial detriment to (and, therefore, would not have been in the best interests of) KTVU, Inc., and the minority shareholders of its ultimate parent, petitioner.  We agree with petitioner that such a transfer would represent a breach of the majority shareholder's and directors' fiduciary duties to petitioner and to the minority shareholders who, unlike the beneficiaries of the (majority) shareholder trusts, did not own interests in the family partnerships and, therefore, would not be made financially whole for the likely shortfall in income and liquidation (or sale) proceeds.

In United States v. Byrum, supra, the decedent owned a majority of the stock in three corporations and transferred shares in those corporations to an irrevocable trust for his children.  He retained the right to vote the transferred shares, veto any investments and reinvestments by the trustee, and replace the trustee.  The Commissioner determined that those retained rights caused the values of the shares to be includable in his gross estate under either section 2036(a)(1) (retention of the enjoyment of or right to income from the property) or section 2036(a)(2) (the right to designate who shall enjoy the property or the income therefrom).  As we observed in Chambers v.

Commissioner, 87 T.C. 225, 232 (1986), the Supreme Court in

Byrum, in rejecting the Commissioner's contentions, "repeatedly

emphasized the fiduciary duties of a majority shareholder and of

the directors of a corporation."  The Supreme Court outlined the

constraints on majority shareholders and directors of a

corporation as follows:

> Whatever power Byrum may have possessed with respect to
> the flow of income into the trust was derived not from
> an enforceable legal right specified in the trust
> instrument, but from the fact that he could elect a
> majority of the directors of the three corporations.
> The power to elect the directors conferred no legal
> right to command them to pay or not to pay dividends.
> A majority shareholder has a fiduciary duty not to
> misuse his power by promoting his personal interests at
> the expense of corporate interests.  Moreover, the
> directors also have a fiduciary duty to promote the
> interests of the corporation.  However great Byrum's
> influence may have been with the corporate directors,
> their responsibilities were to all stockholders and
> were enforceable according to legal standards entirely
> unrelated to the needs of the trust or to Byrum's
> desires with respect thereto.  [United States v. Byrum,
> supra at 137-138; fn. refs. omitted.]

In the light of the Supreme Court's reasoning in Byrum, we

agree with petitioner that, on the evidence before us, it would

be improper to find that Mrs. Chambers and Mrs. Anthony, as both

directors of petitioner and trustees of the shareholder trusts,

purposely acted for the benefit of the trust beneficiaries (and

to petitioner's detriment) by directing KTVU, Inc., to distribute

"extra" partnership interests to the other KTVU Partnership

partners contrary to their fiduciary duty to petitioner and its

minority shareholders.

(c)  <u>Conclusion</u>

The foregoing factors (the nontax business reasons for the formation of KTVU Partnership, the executive committee resolution, the use of outside appraisals to determine and, later, increase the family partnerships' capital contributions to KTVU Partnership, and the fiduciary responsibility constraints against self-serving actions by the majority shareholders and directors of petitioner) demonstrate that there is no reason to conclude that either Mrs. Chambers or Mrs. Anthony or any of petitioner's other directors intended a gratuitous transfer by KTVU, Inc., to KTVU Partnership of station assets worth $60.5 million.  Rather, assuming that that transfer did, in fact, occur, the undisputed facts strongly indicate that it was unintentional.  Therefore, we conclude that KTVU, Inc.'s transfer of the station assets to KTVU Partnership was not intended to provide a gratuitous economic benefit to the other partners and, derivatively, to the shareholder trusts.

(2)  <u>Existence of a Benefit to the Shareholder Trusts</u>

(a)  <u>Analysis</u>

The terms of the three shareholder trusts make clear that Mr. Cox intended to have all the net income therefrom paid to (1) Mrs. Chambers and Mrs. Anthony (under the Dayton trust (at all times here relevant)), (2) Mrs. Chambers (under Atlanta Trust I), and (3) Mrs. Anthony (under Atlanta Trust II).  The trust terms also make clear his intent that only upon the death of those

income beneficiaries were the trust corpora to be distributed to his children's lineal descendants.

In general, the terms of the trust determine the nature and extent of the duties and powers of a trustee.  3 Restatement, Trusts 3d, sec. 70 (2007).  It is also generally accepted that a trustee's first or primary duty is to (1) act wholly for the benefit of the trust, (2) preserve the trust assets, and (3) carry out the settlor's intent.  See 76 Am. Jur. 2d, Trusts, sec. 331 (2005); see also 90A C.J.S., Trusts, sec. 321 (2002) ("By accepting the trust, a trustee becomes bound to administer it, or to execute it, in accordance with the provisions of the trust instrument and the intent of the settlor" (fn. refs. omitted)); id. sec. 322 ("It is the trustee's paramount duty to preserve and protect the trust estate in compliance with the terms of the trust.").[25]

---

[25] As evidenced by their filings in Chambers v. Commissioner, docket Nos. 16698-06 and 16699-06, the parties agree that the Atlanta trusts, created in Georgia, are governed by Georgia law and the Dayton trust, created in Ohio, is governed by Ohio law.  The laws of those two States generally incorporate and are consistent with the foregoing principles of trust law. See, e.g., Ga. Code Ann. sec. 53-12-190 (1997) (Trustee duties) (generally applying "the common law duties of the trustee"); id. sec. 53-12-211 (Duty of trustee as to receipts and expenditure) (generally requiring compliance with "the terms of the trust"); Ohio Rev. Code Ann. sec. 5808.01 (2006) (Duty to administer trust) ("[T]rustee shall administer the trust in good faith, in accordance with its terms and purposes and the interests of the beneficiaries".); id. sec. 5808.04 (Prudent administration) ("A trustee shall administer the trust as a prudent person would and shall consider the purposes, terms, distributional requirements, and other circumstances of the trust.").

If, as respondent argues, Mrs. Chambers and Mrs. Anthony, through their control over the corporate actions of petitioner, caused petitioner to have KTVU, Inc., make a gratuitous transfer of partnership interests representing as much as $60.5 million in station assets to the family partnerships, they necessarily would have violated their duties as trustees of the shareholder trusts. By stripping the trust corpora of valuable assets for inadequate consideration, Mrs. Chambers and Mrs. Anthony would have failed to preserve the trust assets; by granting their lineal descendants (holders of the remainder interests) immediate access to both income and principal attributable to the gratuitously transferred assets (through membership in the family partnerships), they would have failed to carry out the settlor's (Mr. Cox's) intent as expressed in the trust instruments. As respondent suggests, the shifting of assets from petitioner (the stock of which constituted the entire corpus of each shareholder trust) to KTVU Partnership may have benefited the remainder beneficiaries by accelerating their enjoyment of income and principal and satisfied the desire of Mrs. Chambers and Mrs. Anthony to shift trust income from themselves as life beneficiaries to the remainder beneficiaries. Nevertheless, the beneficiaries are not the trusts, and Mrs. Chambers's and Mrs. Anthony's fiduciary obligation under the trusts was to administer the trusts in accordance with the terms thereof, not in

accordance with the conflicting desires of the beneficiaries.[26] Indeed, one can imagine the trustees' actions being carried to their logical extreme whereby the trustees would have petitioner transfer all its assets to KTVU Partnership thereby leaving the trusts holding stock in an empty shell and, in effect, terminating the shareholder trusts. Under those circumstances, one would be hard pressed to conclude that the trustees had acted for the benefit of the shareholder trusts.[27]

---

[26] In this discussion, we treat the shareholder trusts as entities separate and apart from the trustees and beneficiaries. That treatment appears to be in accord with the definition of a trust set forth in 1 Restatement, Trusts 3d, sec. 2 (2007). That section defines a trust as, in essence, "a fiduciary relationship with respect to property". In "Comment a. Terminology", the authors of the restatement add the following clarification:

> Increasingly, modern common-law and statutory concepts and terminology tacitly recognize the trust as a legal "entity," consisting of the trust estate and the associated fiduciary relation between the trustee and the beneficiaries. This is increasingly and appropriately reflected both in language (referring, for example, to the duties or liability of a trustee to "the trust") and in doctrine, especially in distinguishing between the trustee personally or as an individual and the trustee in a fiduciary or representative capacity.

[27] This analysis is consistent with our recent decision in Santa Fe Pac. Gold Co. v. Commissioner, 132 T.C. ___ (2009), in which we held that the taxpayer's payment of a $65 million "termination fee" to a putative white knight in connection with a hostile takeover of the taxpayer by another corporation constituted a currently deductible expenditure. In reaching that result, we noted that the taxpayer's board of directors approved the hostile takeover and rejected the "white knight" because "Delaware fiduciary duties laws required Santa Fe's board to obtain the highest value for the company's shareholders." Id. at ___ (slip op. at 30). After the hostile takeover that triggered the termination fee, the acquiring company fired the taxpayer's employees, released most of its management, shut down its headquarters, discarded its business plans, and, therefore,

(continued...)

In determining that actions by a trustee that violate the terms of a trust, but are favored by the trust beneficiaries, may be detrimental to the trust, we are mindful of the general rule that a settlor or grantor who is not also a trust beneficiary (e.g., Mr. Cox were he still alive) may not maintain a suit to enforce the terms of the trust. See, e.g., 3 Scott, Trusts 211 (4th ed. 1988) (interpreting 1 Restatement, Trusts 2d, sec. 200 (1950)) ("Where a trust is created inter vivos and the [nonbeneficiary] settlor is still alive, it would seem that he cannot maintain a suit to enforce the trust."); 76 Am. Jur. 2d, Trusts, sec. 615 (2005) ("An action * * * to enforce the trust must ordinarily be brought by beneficiaries, trustees, or someone representing them, and not the settlor of the trust or a representative of the settlor." (Citation omitted.)). The reason for the nonbeneficiary settlor's inability to sue the trustee to enforce the terms of the trust is the absence of a contractual relationship between the settlor and the trustee. See 3 Scott, supra at 191-193; Gaubatz, "Grantor Enforcement of Trusts: Standing in One Private Law Setting", 62 N.C. L. Rev. 905, 909-912 (1984). Rather, the trustee's fiduciary obligations are

---

[27](...continued)
harmed rather than benefited the taxpayer. For that reason, we held the termination fee to be currently deductible. In so doing, we distinguished INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992), which requires the capitalization of fees that provide a benefit to the taxpayer extending beyond the taxable year in issue. Id. at ___ (slip op. at 51). In effect, our finding of no benefit to the taxpayer treated as irrelevant the obvious financial benefit to the taxpayer's shareholders who stood, in relation to the taxpayer, as the beneficiaries of the shareholder trusts stand in relation to those trusts.

generally considered to run to the beneficiaries, providing the beneficiaries with exclusive rights of enforcement against the trustee. See 1 Restatement, Trusts 2d, secs. 197-200 (1959); 3 Scott, supra at 209, 211-212. Both Georgia and Ohio law appear to be consistent with that precept. See Ga. Code Ann. sec. 53-12-193 (2003); Ohio Rev. Code Ann. secs. 5810.01 and 5810.02 (2006).[28]

Assuming that Mr. Cox or his representative would have been without standing to sue to enforce the terms of the shareholder trusts and that the trust beneficiaries would benefit from and be

---

[28] There are indications that the judicial bias against enforcement of the settlor's intent may be softening. See 3 Scott, Trusts 218 (4th ed. 1988) ("The tendency of American courts has been to lay an increasing emphasis on the function of the court in carrying out the wishes of the settlor."). For commentary questioning universal application of the rule against settlor enforcement of trust terms, see Gaubatz, "Grantor Enforcement of Trusts: Standing in One Private Law Setting", 62 N.C. L. Rev. 905, 906 (1984):

> A grantor who creates a spendthrift or material purpose trust relies on the trustee to resist the importunings of the beneficiary to deviate from the trust to his immediate advantage. If the beneficiary seeks such deviation, his desires are contrary to those of the grantor, even if not contrary to the grantor's economic interests. The attempt thus raises the question of the grantor's right to prevent the trustee from acceding to the beneficiary's demands. [Fn. ref. omitted.]

See also Note, "Right of Settlor To Enforce a Private Trust", 62 Harv. L. Rev. 1370, 1376 (1949):

> But there are some indications, at least in the case of spendthrift trusts, of a policy to give the settlor's intention affirmative effect against an unwilling trustee. Where this * * * policy is present, the settlor should be allowed to enjoin unauthorized payments of income or principal, and, wherever feasible, to follow the property into the hands of the payees and reestablish the trust. [Fn. refs. omitted.]

in favor of any gratuitous transfer of trust assets to the family partnerships, that gratuitous transfer nonetheless would be harmful to the shareholder trusts.  As noted supra, it would necessarily diminish trust principal and income and, therefore, it would necessarily diminish the economic well-being of the shareholder trusts, irrespective of Mr. Cox's right (were he alive) to enforce the terms of those trusts.  In short, the enhanced benefits to the trust beneficiaries arise at the expense of the shareholder trusts.

### (b)  Conclusion

KTVU, Inc.'s assumed gratuitous transfer of an interest in KTVU Partnership to the family partnerships did not benefit the shareholder trusts.

### (3)  Conclusion Concerning Application of the Primary Purpose Test

KTVU, Inc.'s assumed gratuitous transfer of an interest in KTVU Partnership to the family partnerships does not satisfy the primary purpose test as set forth in Sammons v. Commissioner, 472 F.2d 449 (5th Cir. 1972), and Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d 634 (11th Cir. 1984).

### 3.  Conclusion

KTVU, Inc.'s assumed gratuitous transfer of an interest in KTVU Partnership to the family partnerships did not constitute a

distribution to the shareholder trusts subject to section 311(b).[29]

An order granting petitioner's

motion for summary judgment will

be issued.

_____

[29] We note in closing that, were respondent able to establish that (1) petitioner, KTVU, Inc., KTVU Partnership, and the family partnerships were all under common control, and (2) the allocation of income and liquidation (or sales) proceeds among KTVU, Inc., and the family partnerships was unreasonable (i.e., it did not reflect their true taxable incomes according to their relative contributions to KTVU Partnership), circumstances that, in fact, he alleges, the Secretary has authority under sec. 482 to allocate income and deductions among related partners to clearly reflect income. See, e.g., sec. 1.704-1(b)(1)(iii), Income Tax Regs. ("[A]n allocation that is respected under section 704(b) and this paragraph nevertheless may be reallocated under * * * section 482".). We are not called upon to review the Secretary's exercise of his authority under sec. 482 in the case before us. It may be that respondent's decision to proceed against petitioner under sec. 311(b), rather than against the partners in KTVU Partnership under sec. 482, is attributable, at least in part, to the fact that the latter approach would not have resulted in an immediate tax on the entire $56,182,115 deemed gain attributable to the assumed transfer of partnership interests in KTVU Partnership by KTVU, Inc., to the family partnerships. Instead, because KTVU, Inc., and the family partnerships were all domestic taxpayers, a reallocation of KTVU Partnership's income among them most likely would have resulted in little, if any, additional tax in 1993 and the following years.

APPENDIX

